# CHARLESTON

## POCAHONTAS COKE COMPANY *v.* POWHATAN COAL & COKE COMPANY.

Submitted September 11, 1906.   Decided November 20, 1906.

1. INJUNCTION—*Motion to Dissolve.*
   Upon the hearing of a motion to dissolve an injunction before answer, the allegations of the bill must be taken as true.  (p. 518.)

2. "ANTI TRUST LAW"—*Illegal Contracts.*
   Before a contract can be declared illegal by reason of the act of Congress known as the "Anti-trust Law," passed July 2, 1890, it must appear that the contract is clearly within the provisions of the act.  (p. 518.)

3. CONTRACT—*Restraint of Trade.*
   A contract which is in unreasonable restraint of trade is void at common law, because contrary to public policy.  (p. 519.)

4. SAME—*Restraint of Trade Defined.*
   A contract, combination or trust among various producers and sellers of a commodity, the direct and necessary or natural effect of which is to restrain competition and control the prices of such commodity, is in unreasonable restraint of trade, and void at common law because contrary to public policy.  (p. 519.)

5. SAME—*Things Considered in Determining Contract in Restraint of Trade.*
   In determining whether or not a contract or combination is in unreasonable restraint of trade, the subject matter of the contract or combination, the situation of the parties and all the circumstances attending the transaction should be considered.  (p. 519.)

6. SAME—*Commodity.*
   In determining whether or not a contract or combination is in reasonable restraint of trade, it is immaterial whether or not the commodity which is the subject matter of the contract or combination is of prime necessity, if the commodity is an article of legitimate trade or commerce.  (p. 522.)

7. UNREASONABLE RESTRAINT OF TRADE—*Determined by What May be Done Under Contract.*
   In determining whether or not a contract is in unreasonable restraint of trade, all the powers of the contract should be considered, and its character determined not alone by what has been done under it. but by what may be done under it when all of its powers shall have been fully exercised.  (p. 524.)

8.  Same—*Change in Prices of Subject of Contract.*
    It is no defense to the illegality of a contract or combination which is in unreasonable restraint of trade to show that the prices of the commodity which constitutes its subject matter have not been changed, or even that such prices have been lowered. (p. 525.)

9.  Same—*Partial.*
    . Unreasonable restraint of trade which is only partial is illegal. (p. 525.)

10. Same—*Monopoly.*
    In order for a combination or trust to be in unreasonable restraint of trade, it is not necessary that a complete monopoly be formed. The combination or trust is in unreasonable restraint of trade if it tends to monopoly and is to the injury of the public. (p. 525.)

11. Same—*Contract Void.*
    If a combination or trust is illegal because in unreasonable restraint of trade, the contract whereby such combination or trust was effectuated and established is void, because in unreasonable restraint of trade. (p. 525.)

12. Same—*Enforcement.*
    The courts will not enforce such contract between the parties to it, because of its void character. (p. 529.)

13. Contract Under Consideration.
    The contract, the form of which is set out and referred to as "contract B" in the opinion below, is in unreasonable restraint of trade and void because against public policy. (p. 529.)

14. Preliminary Injunction—*Motion to Dissolve—Equity of Bill.*
    Where there is no equity in the bill, a motion to dissolve a preliminary injunction should be sustained. (p. 532.)

Appeal from Circuit Court, McDowell County.

Bill by Pocahontas Coal Company, appellee, against Powhatan Coal & Coke Company, appellant. Decree for plaintiff, and defendant appeals.

*Remanded.*

W. A. Glassgow, Jr., Holt & Duncan, Wyndham Stokes, for appellee.

Rucker, Anderson, Strother & Hughes; Strother, Taylor & Flanagan; Vinson & Thompson; R. C. & Bernard McClaugherty, for appellant.

COX, JUDGE:

The appellant, Powhatan Coal & Coke Company, complains of the order of the judge of the circuit court of McDowell county, made in vacation on the 16th of July, 1906, overruling its motion to dissolve an injunction awarded by said judge in vacation on the 2nd of July, 1906, upon presentation of a bill in equity by appellee, Pocahontas Coke Company, against appellant. In order to have a proper understanding of the questions involved in this case a somewhat extended statement is necessary. Appellee by its bill, upon which the injunction was awarded, alleges substantially that it is a corporation under the laws of West Virginia, and that it was organized pursuant to, and that the main object of its organization is set forth in, a contract among the various producers and manufacturers of coke in the Pocahontas-Flat Top Coal Field, dated the 29th of June, 1905, a copy of which is filed with the bill, and omitting signatures, is as follows:

"This agreement made this 29th day of June, 1905, between the undersigned, producers and manufacturers of coke, in the Pocahontas-Flat Top Coal Field.

"Witnesseth, that whereas, it is deemed expedient that there should be some arrangement perfected, to improve conditions in the manufacture, inspection and shipment of coke, and to regulate and to improve the quality of coke manufactured in the district mentioned,—therefore the parties hereto, do hereby agree:

"I. That upon the signing of this agreement, the parties hereto will apply for a charter and organize a corporation, to be known as the Pocahontas Coke Company, the authorized capital stock of which shall be one hundred and fifty thousand dollars ($150,000) each share of which shall be of the par value of ten (10) dollars, and the officers of which company shall be a President, a Vice-President, a Secretary and Treasurer (which latter two offices may be held by one person,) a General Manager, who may be President or Vice-President, and a Board of Directors of Seven or more members.

"II. The object of said Pocahontas Coke Company shall be, to facilitate the manufacture, inspection, ship-

ment and betterment of coke from the Pocahontas Flat Top Coal Field, and to regulate, improve and standardize the quality of coke manufactured in the district aforesaid.

"III.   The parties hereto, who are operators of coke ovens, shall be entitled to subscribe for one share of the capital stock of said Company, for every coke oven owned by such party, provided that immediately upon the allotment of such stock to such party he or it shall make with Pocahontas Coke Company a three-year contract for the sale by it of all coke produced by such operator at a commission of five cents (5c) per net ton, on the coke sold; and provided, further, that no stock subscription in Pocahontas Coke Company shall be accepted from any operator until such three-year contract, as to coke produced by him or it, shall have been made and entered into.

"IV.   The subscriptions to the stock of said Company shall be paid, fifty per cent (50%) in cash, and the balance on call of the Board of Directors, as the needs of the Company may require.

"V.   It is further agreed, that there shall be named by a majority of the parties to this agreement three (3) trustees, who shall hold the stock of each party hereto, which when issued shall be properly assigned in blank and deposited with said Trustees.   In case of death or redemption of any trustee, his successor shall be elected by a majority of the stockholders of Pocahontas Coke Company, at a special meeting called for that purpose, or at any general or regular meeting.

"VI.   After the payment of the expenses of operating Pocahontas Coke Company, the surplus, if any, derived by said Company from the commissions received by it from the sale of coke or otherwise, shall be declared annually as dividends upon the stock held by each stockholder, each stockholder to have the same proportion of such surplus as the number of tons of coke furnished by him or it, bears to the whole number of tons of coke furnished to said Company for sale.   The stock issued by such company shall at all times be held by the trustees, as aforesaid, but the voting power thereon shall be and continue in the stockholders.   Each share of stock shall be entitled to one vote.

"VII.   If a stockholder in Pocahontas Coke Company, shall decline to renew his or its contract aforesaid, then the stock of such person or corporation shall be sold by the Trustees to Pocahontas Coke Company, at its book value, and the proceeds thereof shall be turned over to such person or corporation, declining to renew his or its contract as aforesaid.

"VIII.   There shall be for the Company a General Manager who shall have active and general charge and management of the business of the Company, and who shall not be interested in any coke operation or plant, and said General Manager shall be entirely impartial and disinterested and have no special interest in any particular coke property or operation, and shall devote his entire time to the business of Pocahontas Coke Company.

"IX.   There shall be a chief inspector and such assistant inspectors as may be necessary, who shall be disinterested and impartial persons, without any interest in any plant or operation producing coke, and such inspector and his assistants shall inspect the coke produced by the stockholders of Pocahontas Coke Company, and shall enforce such rules and regulations as to the manufacture and inspection of coke as may be prescribed by the Board of Directors.

"X.   Pocahontas Coke Company is to take from the parties with whom it has contracts as aforesaid, all of the coke produced by them, to the extent that railroad facilities may be furnished to transport the same, as long as market conditions will enable Pocahontas Coke Company to dispose of same at or above the cost of production.

"XI. The parties to this agreement are to keep such ovens burning as may be necessary to supply their or its proportion of the sales of coke made by Pocahontas Coke Company.

"XII.   The organization of Pocahontas Coke Company is not to be delayed by reason of any existing contracts, which the parties hereto may have for the sale of coke; but said contract shall be assumed and carried out by Pocahontas Coke Company, upon the terms thereof and it shall be entitled to its commission upon the coke delivered thereunder.

"XIII. If at any time the coke produced by any person or corporation with whom or which Pocahontas Coke Company may have a contract as aforesaid, shall be unsatisfactory, then such person or corporation shall bring his or its coke up to the proper standard and carry out such directions in the manufacture, handling and preparation of coke as may be prescribed by the Board of Directors of Pacahontas Coke Company, or by its Executive Committee.

"The contract of each stockholder of Pocahontas Coke Campany shall provide for the sale of its or his entire output of coke through Pocahontas Coke Company in the market, and in said contract there shall be prescribed a penalty or liquidated damages in case said operator shall sell his or its coke through any other agency, or to any other parson, than Pocahontas Coke Company, and such other provisions as may be mutually necessary for the protection of the producer of coke and Pocahontas Coke Company, and for the inspection and improvement of the coke and bringing the same to a proper standard and authorizing the Inspectors to reject any coke not up to the proper standard. Any party to this agreement furnishing coke, for which the purchaser may decline to pay the full price, on account of unsatisfactory quality, shall bear such loss.

"Witness the following signatures:"

This contract purports to have been executed by twenty of said coke producing and manufacturing corporations, and hereafter will be referred to as "contract A."

Appellee by said bill further alleges that the parties to contract A, including appellant, subsequently became stockholders of the appellee under the terms of said contract, and that appellant and every other stockholder of appellee, in accordance with the requirement of contract A, entered into a "uniform contract" with appellee whereby appellee was appointed the true and legal sole sales agent of the producers and manufacturers of coke in said coal field (they being the stockholders of appellee,) for the purpose of selling all coke produced or manufactured at the ovens owned, or which during the period covered by contract A might be owned, by appellant, and such other parties as should enter into such uniform contract. A blank copy of said "uniform contract" is filed with the bill, and hereafter will be referred to as "contract B." It is as follows:

"This agreement, made this —— day of ——, 1905, between ————————, a corporation chartered and organized under the laws of the State of West Virginia, of the first part, and Pocahontas Coke Company, a corporation chartered and organized under the laws of the State of West Virginia, of the second part;

"Witnesseth, That for and in consideration of the mutual covenants and agreements to be performed by each, as well as the sum of One Dollar paid by each party to the other, the receipt whereof is hereby acknowledged, the parties hereto do hereby agree as follows, towit:

"First: The party of the first part does hereby make, constitute and appoint the party of the second part its true and lawful sole sales agent for the purpose of selling all coke produced or manufactured at the ovens now owned or which may during the period covered by this contract, or any extension thereof, be owned by the party of the first part. The party of the first part agrees to deliver, at its ovens, to the party of the second part all the coke produced or manufactured by it during the period covered by this contract or any extension thereof; Provided, however, That whereas the party of the second part has made, or may make agreements or contracts, to act as the selling agent for other producers of coke, than the party of the first part, therefore the party of the second part shall only be required to take such quantity of coke from the parties from whom it acts as agent, as railroad facilities may be furnished to transport, and the party of the second part shall also only be required to take such quantity of coke from all of the persons whom it represents as agent, as the market conditions will enable it to dispose of, at or above the cost of production. And if the party of the second part shall be unable to take all of the coke produced by the principals represented by it, it shall only be required to take from the party of the first part such proportion of the whole amount of coke handled by it, as the number of coke ovens owned by the party of the first part, bears to the number of coke ovens owned by all producers and manufacturers of coke for whom the party of the second part shall act as agent.

"Second: The party of the second part agrees to sell said

coke, delivered to it as aforesaid, by the party of the first part, for the best price that the market at the time of such sale will afford.

"Third:  The party of the first part agrees to pay to the party of the second part and the party of the second part agrees to accept a commission on sales of coke made by it as such agent, of five cents (5c) per ton of 2000 pounds, on all coke sold for the party of the first part.  The party of the second part agrees to accept said commissions upon the condition that it is hereby employed as the sole and exclusive sales agent of the party of the first part.

"Fourth:  It is further agreed, by the parties hereto, that in case of a breach of the covenant on the part of the party of the first part to deliver, at its ovens, to the party of the second part, all the coke produced or manufactured by it, during the period covered by this contract or any extension thereof, that the party of the second part shall, at its option, be forthwith entitled to terminate this agreement, and in the event of such termination the party of the first part shall forfeit all interest in or right to deliver coke upon any contracts taken or sales made, theretofore, by the party of the second part, and which at the time of such termination, remain wholly or partially unfilled, but this provision shall not be so construed as to relieve the party of the first part from furnishing its due proportion of coke, to enable the party of the second part to fill such unexpired or incomplete contracts, if required so to do, by the party of the second part, notwithstanding notice of the termination of this contract may have been given by the party of the second part to the party of the first part.

"Fifth:  The party of the second part agrees to act as agent of the party of the first part upon the terms and conditions in this agreement expressed, and to use its best efforts to sell the coke of the party of the first part at the best price that the market will afford.

"Sixth:  The party of the second part hereby guarantees payment for all coke sold by it, as such agent, at the average price for all coke handled by it, passing the weigh scales each month, and agrees to take charge of the inspection, shipment and delivery of said coke and the collection of bills therefor, pay the cost of such inspection and

all tolls and other charges in connection with such shipment and delivery, and to pay to the party of the first part on the 25th day of each and every month during the continuance of this contract, the proceeds of all coke delivered for its account at the average price aforesaid and passing the weigh scales of the Norfolk & Western Railway Company, or the Western Weighing Association during the next preceding calendar month; the weights on which said scales shall govern and be binding upon both parties to this agreement. It is also agreed that all expenses connected with the selling of such coke shall be borne by the party of the second part.

"Seventh: The party of the second part agrees to keep complete and accurate books of account and proper vouchers for all transactions as such agent, which books and vouchers and all other papers relating to such transactions shall at all times during business hours of the day be open to verification by a disinterested expert accountant, appointed by the party of the first part. It is further agreed that the party of the second part shall furnish to the party of the first part as soon as convenient after the first day of each calendar month, during the continuance of this agreement, a statement showing the total tonnage handled by it from each and every person during each month, together with a statement of the average price obtained for such coke.

"Eighth: The party of the first part under this agreement shall be responsible for the quality of coke it ships, and it agrees to assist in building up and maintaining the standard of coke; and it is further agreed by the party of the first part that the size of slack and freedom from impurities, shall be such as to insure the making of good merchantable coke, and in order that the coke manufactured by the party of the first part shall be loaded into cars free from ashes and breeze, it is hereby agreed that all coke loaded and shipped hereafter shall be loaded by means of standard 14 tine forks of 20 inch spread; out to out.

"Ninth: The party of the second part reserves the right to employ an inspector or inspectors to examine and report to the party of the second part on the quality and grade of

the coke manufactured by the party of the first part, and also to report as to the care of the party of the first part in loading the same at the ovens.   And the party of the first part hereby agrees that its Manager, 'Coke-Boss,' or other person in authority, shall co-operate with the inspector or inspectors of the party of the second part, in bringing the coke manufactured by it up to the standard now or hereafter established by the party of the second part.   And the party of the first part further agrees that it will manufacture such coke in accordance with the rules now or hereafter established and promulgated by the party of the second part, and that it will also see that the coke is loaded into the cars free from ashes and breeze and in good order for shipment.

"It is further agreed by the party of the first part that the party of the second part shall endeavor to sell all inferior coke furnished to it, by the party of the first part, for the account of the party of the first part, making return to it of the price received therefor, less cost of sale and commission.

"Tenth:   This agreement shall continue in force for three years from the———day of———, 1905.   And after the date for expiration thereof, this contract shall continue in force for like periods of three years unless terminated by notice as hereinafter set forth; Provided, that this agreement may be terminated by either party hereto, at the end of the first or any of said periods of three years aforesaid. by giving to the other party hereto a written notice, three months or more before the end of any such period of three years, of its desire to terminate the same.

"In witness whereof, etc."

Appellee by its bill makes certain other allegations intended to show that the damages to it will be irreparable if appellant shall break, and withdraw from, said contract B, including an allegation that appellee has outstanding contracts for the sale of coke, which it will be unable to fill if appellant shall be permitted to withdraw from said contract B.   Appellee by its bill further alleges in substance that on the 27th day of June, 1906, it received a notice from appellant, whereby the latter undertook to terminate its contract B and gave notice that it would no longer deliver coke to

appellee under said contract, and that appellee also received similar notices from seven of the corporations including appellant, which entered into contracts A and B.

The injunction awarded on said bill restrained appellant from selling through any agents or agencies other than appellee, or in any other way, any of the coke covered by the terms of contract B, which appellee had before that time, or might afterwards before the expiration of said contract, sell in accordance with the terms thereof, and from refusing to carry out said contract by withdrawing the coke aforesaid from appellee as its selling agent for the same, and required appellant to continue to ship its coke to the order of appellee as its sole selling agent under said contract until the further order of the court.

The appellee seeks by this preliminary injunction to enforce the performance of contract B until the further order of the court. The motion to dissolve was made in vacation, before answer by appellant. No answer was offered at the hearing of the motion. Under these circumstances, the allegations of the bill must be taken as true on the hearing of the motion. An affidavit was filed at the hearing by appellant, without answer to the bill, and was considered by the judge in determining the motion. The affidavit tended to show the existence of facts not disclosed by the bill, or facts explanatory of the allegations of the bill. It should not have been considered in the determination of the motion. No answer having been filed, the motion should have been determined alone from the allegations of the bill, taking them as true.. *Peatross* v. *McLaughlin,* 6 Grat. 64; *Ludington* v. *Tiffany,* 6 W. Va. 11; *Town of Harper's Ferry* v. *Kaplon & Bro.,* 58 W. Va. 482. In determining whether or not the judge of the circuit court erred in refusing to dissolve the injunction, we must do so without regard to the additional facts which the affidavit tends to show.

One of the several grounds assigned why the circuit judge should have sustained the motion to dissolve is that the contract sought to be enforced by the bill is in restraint of trade, tends to monoply, and is against public policy. Under this ground, it is contended:    (1) that the contract is illegal under the act of Congress known as the "Anti-Trust Law," passed July 2, 1890; (2) that the contract is illegal under the

rules of the common law.  The act of congress declares
illegal every contract, combination in the form of trust or
otherwise, or conspiracy in restraint of trade or commerce
among the several states or with foreign nations.  Before we
can hold the contract here involved to be illegal under the
act of Congress, the contract must clearly appear to be within
the provisions of the act.  *Northern Securities Co.* v. *U. S.*,
193 U. S. 197; *U. S.* v. *Freight Association*, 166 U. S. 290;
*Slaughter* v. *Thacker Coal and Coke Co.*, 55 W. Va. 642.
The facts before us fail in one essential and necessary par-
ticular to bring the contract within the inhibition of the act
of Congress.  It does not appear that the contract contem-
plated interstate or international commerce, in dealing with
the coke which constituted its subject matter.  The contract
is capable of being fully performed within this State.  There
is nothing on the face of the papers from which we can infer
with certainty that commerce outside of the State was con-
templated, and we cannot therefore, in the present condition
of the record, declare the contract to be illegal under that
act.

Leaving the act of Congress, we come to a consideration
of the contract under the principles of the common law.
For the purpose of determining whether or not the contract
is illegal under the rules of the common law, we consider not
only the contract, but its subject matter, the situation of the
parties, and all the circumstances surrounding the transac-
tion, so far as they are disclosed by the allegations of the
bill.  Beach on Monop. & Indus. Trusts, § 46; Eddy on Com-
binations, § 784.  Coke, the subject matter of the contract, is
a legitimate article of trade and commerce, a commodity of
extensive use.  Under the recent decisions, it is immaterial
whether it is an article of prime necessity or not.  If a con-
tract concerning an article of prime necessity would be
illegal as in unreasonable restraint of trade, it is likewise
illegal if its subject matter be any other article of legitimate
trade or commerce.  20 Am. & Eng. Enc. Law 849-50; *U. S.*
v. *Addyston Pipe & Steel Co.*, 85 Fed. Rep. 271.  If the
questions were material, we would have little difficulty in
arriving at the conclusion that coke, like coal, is properly
classified under the head of necessaries.

Twenty separate and independent coke manufacturing and

producing corporations, operating in the same coal field, entered into contract A, and afterwards each entered into contract B. Do these contracts, under the circumstances appearing, effectuate and consummate an arrangement, combination or trust in unreasonable restraint of trade, tending to monopoly and against public policy, under the common law? If so, every contract whereby such combination or trust was effectuated and established is void and unenforcible between the parties, and the courts will refuse to assist them in enforcing its performance. 20 Am. & Eng. Enc. Law 857; *Charleston Nat. Gas Co.* v. *Kanawha Nat. Gas, Light & Fuel Co.*, 58 W. Va. 22. We approach the determination of this question realizing the great change that has taken place in industrial conditions and in business methods from those prevailing in the early history of the common law, and that courts are constantly called upon to apply the principles of that law to such new conditions, in view of many decisions diverse and ofttimes conflicting, and amid an evolution of the application of old principles rather than the announcement of new principles, and to reach conclusions guided by what they deem the best considered cases and authorities on the subject.

Monopoly, in its original sense, was an exclusive right granted by the State to one or a few of something which was before of common right. As now used and understood, monopoly embraces any combination the tendency of which is to prevent competition in its broad and general sense, and to control prices to the detriment of the public. A trust has been defined as a contract, combination, confederation or understanding, express or implied, between two or more persons, to control the price of a commodity or services for the benefit of the parties thereto, and to the injury of the public, and which tends to create a monopoly. "More accurately, perhaps, it is the entity resulting from the contract etc., just described." 20 Am. & Eng. Enc. Law 846, and cases there cited. It seems that such unlawful combination may be formed orally, and that a writing is not necessary to its illegality. *Harding* v. *American Glucose Co.*, (Ill.) 74 Am. St. Rep. 189. Monopolies are condemned at common law, as being in restraint of trade and against public policy. The *Case of Monopolies*, 11 Coke 84: *Mitchel* v. *Reynolds*, 1 P. Williams 181.

In his Work on The Fourteenth Amendment, page 378, Judge Brannon, of this Court, in concluding his remarks on trusts and combinations, says: "The nation has no power over the subject, except so far as such trusts may effect interstate commerce. The case just mentioned (85 Fed. 271) concedes full power of the states over trusts so far as they effect their internal commerce. So it can be said that, regardless of the benefits that may accrue from trusts, as the Court said as to interstate commerce, we may say as to intra-state commerce, when the question of the lawfullnes of a combination arises, that if its logical, natural, probable effect is to enhance prices, or put it in the power of the combination to do so, or to suppress competition or prejudice the freedom and naturalness of trade, that combination is unlawful."

Concerning monopolies Prof. Pingrey, in his Work on Industrial and Interstate Contracts, sec. 320, says: "At common law, a contract calling for a reasonable restraint of trade will be upheld. It is only the unreasonable restraint of trade that receives the condemnation of the law, whereby monopolies are created. Monopolies may be divided into three classes: 1. All sources of supply may be put in the hands of one company, so no other source of supply is available. Such a monopoly is absolute, and can sell its products at any price limited to the necessities of commerce. 2. The monopoly may have the best and most economical source of supply, but competition still be possible, when competition can be suppressed by selling so low by the monopoly that competition is impossible. 3. The monopoly may use its general control of the market to require all parties to buy from it alone under penalty of being denied further supplies. This method is generally practiced by the monopoly."

In 20 Am. & Eng. Enc. law 849, it is said: "By the weight of recent authority, the character of the article of legitimate trade sought to be monopolized is immaterial, the true test of the illegality of the combination being the injury to the public, and whether its necessary consequence is to control prices, limit production, or suppress competition in such a way as to restrain trade and create a monopoly. To render the combination illegal on this ground, it is not necessary that evil intent or actual injury be shown, but it is

sufficient to know that the inevitable tendency of the act is injurious to the public."

In *C. & O. Fuel Co.* v. *U. S.*, 53 C. C. A. 256, decided by the Circuit Court of Appeals, Sixth Circuit, in which Judge Day delivered the opinion, it was held, in point 4 of the syllabus, that "it is the declared policy of Congress, which accords with the principles of the common law, to promote individual competition in relation to interstate commerce, and to prevent combinations which restrain such competition between their members, or between such members as individuals and outside competitors; and it is no defense to a suit to dissolve such a combination, under the anti-trust law, that it has not been productive of injury to the public, or even that it has been beneficial, by enabling the combination to compete for business in a wider field."

In *Addyston Pipe & Steel Co.* v. *U. S.*, on appeal, 175 U. S. 211, the following language was used by Justice Peckham in delivering the opinion of the Supreme Court of the United States: "We have no doubt that where the direct and immediate effect of a contract or combination among particular dealers in a commodity is to destroy competition between them and others, so that the parties to the contract or combination may obtain increased prices for themselves, such contract or combination amounts to a restraint of trade in the commodity, even though contracts to buy such commodity at the enhanced price are continually being made."

It may be said in this connection that the determination of the question whether or not a contract is in restraint of trade is to be arrived at in exactly the same way and under exactly the same rules, whether the case falls under the provisions of the act of Congress or under the rules of the common law. The difference between the act and the common law does not lie in the manner of ascertaining whether or not restraint exists, but in the degree of restraint required to render the contract illegal. Under the act of Congress, any restraint is illegal, while under the common law only unreasonable restraint is illegal.

In *Horner* v. *Graves*, 7 Bing. 735, the English doctrine is stated as follows: "We do not see how a better test can be applied to the question whether this is or not a reasonable restraint of trade than by considering whether the restraint

is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public.   Whatever restraint is larger than the necessary· protection of the party requires can be of no benefit to either.   It can only be oppressive.   It is in the eye of the law unreasonable.   *Whatever is injurious to the interests of the public is void on the ground of public policy.*"

In the case of *U. S.* v. *Addyston Pipe & Steel Co.*, *supra*, in the Circuit Court of Appeals, Judge Taft in delivering the opinion of the court gave an able exposition of the principles of the common law touching this subject. Certain rules are there laid down for testing a contract as to its being in unreasonable restraint of trade at the common law.   It was there held:   "No contractual restraint of trade is enforceable at common law unless the covenant embodying it is merely ancillary to some lawful contract (involving some such relations as vendor and vendee, partnership, employer and employee), and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party.   The main purpose of ·the contract suggests the measure of protection needed, and furnishes a sufficiently uniform standard for determining the reasonableness and validity of the restraints.   But where the sole object of both parties in making the₀ contract is merely to restrain competition, and enhance or maintain prices, the contract is void."   Judge Taft, after stating five classes of contracts or covenants in restraint of trade at common law, says:   "It would be stating it too strongly to say that these five classes of covenants in restraint of trade include all of those upheld as valid at the common law; but it would certainly seem to follow from the tests laid down for determining the validity of such an agreement that no conventional restraint of trade can be enforced, unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party.   *   *   *   This very statement· of the rule implies that the contract must be one in which there is a main purpose, to which the covenant in restraint of trade is

merely ancillary. The covenant is inserted only to protect one of the parties from the injury which, in the execution of the contract or enjoyment of its fruits, he may suffer from the unrestrained competition of the other. The main purpose of the contract suggests the measure of protection needed, and furnishes a sufficiently uniform standard by which the validity of such restraints may be judicially determined. In such a case, if the restraint exceeds the necessity presented by the main purpose of the contract, it is void for two reasons: First, because it oppresses the covenantor, without any corresponding benefit to the covenantee; and, Second, because it tends to a monopoly. But where the sole object of both parties in making the contract as expressed therein is merely to restrain competition, and enhance or maintain prices, it would seem that there was nothing to justify or excuse the restraint, that it would necessarily have a tendency to monopoly, and therefore would be void. In such a case there is no measure of what is necessary to the protection of either party except the vague and varying opinion of judges as to how much, on principles of political economy, men ought to be allowed to restrain competition. There is in such contracts no main lawful purpose, to subserve which partial restraint is permitted, and by which its reasonableness is measured, but the sole object is to restrain trade in order to avoid the competition which it has always been the policy of the common law to foster.''

Mr. Freeman, in his note to the case of *Harding* v. *Amer. Glucose Co.*, *supra*, discussing the rule laid down by Judge Taft, says: ''This doctrine, we believe, would prove sufficient to deal with most cases of contracts restricting competition and forming unlawful trusts, with this extension of the rule, which the cases seem to warrant, viz., that, even though there be an apparent main lawful contract, yet if its obvious purpose and necessary results are to establish a monopoly, the contract is void. The rule as stated by Judge Taft seems capable of this extension.''

It is deducible from the authorities that, if the direct and necessary or natural effect of a contract or combination among producers and sellers of a commodity is to restrain competition and control prices to the injury of the public when all the powers of the contract or combination shall have been

exercised, the contract or combination is in unreasonable restraint of trade and against public policy. It is unnecessary to enter into a long and tedious enumeration of the many ways in which these ends may be accomplished. Such enumeration would simply encumber the record.

It is no defense to the illegality of a contract or combination which is in unreasonable restraint of trade to show that in the particular case a complete monopoly has not been formed, or that no control of prices has been exercised, or that prices have been lowered and not raised. *U. S.* v. *Addyston Pipe & Steel Co.*, *supra;* Brannon, Fourteenth Amend., *supra;* 20 Am. & Eng. Enc. Law 850. If a contract or combination in unreasonable restraint of trade could not be attacked until a complete monopoly had been formed, then the law against monopolies would be unavailing. In this country it would be almost impossible to combine all the interests in any line of industry into a single and complete monopoly. If only complete monopolies could be reached under the law, a combination could then be formed tending to monopoly and embracing substantially all the evil results of a complete monoply, intentionally leaving out of the combination some one or more of those engaged in the industry, for the very purpose of rendering the combination legal.

A contract which is charged to be in restraint of trade is not to be tested by what has been done under it, but by what may be done under it; not by its performance, but by its powers of performance when fully exercised. Page on Cont., section 433; *Coal Co.* v. *Coal Co.*, 68 Pa. St. 173; *Judd* v. *Harrington*, 139 N. Y. 105.

Many of the later authorities draw a distinction between contracts which were in "restraint of trade," as that phrase was understood in the early history of the common law, and contracts which are in "restraint of competition," and which are also in restraint of trade, as understood in modern times. Eddy on Combinations, section 720; Freeman's Note, *supra.* Both classes of contracts, when unreasonable and to the injury of the public, are alike illegal and against public policy. The illegality of a contract or combination for the restraint of competition does not lie in the agreement not to compete, but in its reflex injury to the public. One way to control prices is to destroy or restrain competition. It has been said that

many of the cases decided in America, holding contracts valid as not being in unreasonable restraint of trade, would have been held otherwise if the modern doctrine as to restraint of competition had been properly applied.

In passing upon a contract claimed to be in restraint of trade, whether the parties agree to refrain from trade or from competition, the courts have endeavored to concede the greatest liberty of contract consistent with the public good. Yet the constitutional liberty of contract has never been held to give to parties the right to contract contrary to public policy and to have such contract respected by the courts.

In the case at bar, it appears that contract A was the first step in the transaction disclosed by the bill. Contract A provides for the execution of contract B by each of the parties to contract A. B is the result and final consummation of A. Both are parts of one arrangement and one transaction, and must be considered together. *George* v. *Cooper*, 15 W. Va. 666; *Cobb* v. *Lumber Co.*, 57 W. Va. 54. Contract A provides for the incorporation of appellee, and how its shares and profits shall be distributed among the parties to contract A. Certain regulations for the management and operation of the appellee were made by the parties to contract A, before the appellee came into existence. Who its incorporators were does not appear—presumably persons interested in the parties to contract A. The allotment of the stock of appellee to each of the parties to contract A was upon condition that such party should make with appellee a three-year contract for the sale by it of all coke produced by such party at a commission of five cents per ton on the coke sold, and upon the further condition that no stock subscription in appellee should be accepted from any party until such three-year contract as to coke produced by it should have been made and entered into. The stock of appellee held by the parties to contract A was to be in the hands of trustees, and if any stockholder should decline to renew the three-year contract the stock of such stockholder was to be sold to appellee at its book value. Pursuant to contract A appellee came into existence, governed and controlled by that contract so far as could be done by such a contract. It may be contended that, as appellee when incorporated was a separate legal entity, empowered to sue and be sued, and was not a

party to contract A, it was not bound by that contract. The answer to this contention is that contract A was made with all the stockholders of appellee, and bound them so far as such contract could bind them; and we are considering the contracts, for the purpose of the question here involved, as if carried out. The stockholders, not in name but in reality, are the owners of the rights and property of an incorporated company. They elect its directors and provide for its management. *Moore* v. *Schoppert*, 22 W. Va. 282; *Sweeney* v. *Refining Co.*, 30 W.Va. 443; *Lamb* v. *Pannell*, 28 W.Va. 667. By contracts A and B, the appellee was made the sole and exclusive sales agent of the parties to said contracts. No price was specified at which sales were to be made. This was left to the appellee. It agreed to use its best efforts to sell at the best price the market afforded. By contract B it was provided, "And the party of the first part further agrees that it will manufacture such coke in accordance with the rules now or hereafter established and promulgated by the party of the second part." Under these contracts, the appellee was empowered not only to fix the price at which sales should be made, but to prescribe the quality of the production. An average price for coke was to be received by each of the parties for its product, except for inferior coke. For the purposes of these contracts, the twenty coke manufacturing and producing corporations were welded into a single concern so far as the market was concerned, without any endeavor to transfer their several properties. We do not think that any one can carefully read the two contracts, in the light of the allegations of the bill, without coming to the conclusion that the appellee, the new corporation, was merely an instrument or means to an end, operated, owned and controlled by the twenty corporations parties to contract A. Every act of this new agent corporation within the powers of these contracts is merely the act of the twenty corporations in conjunction. The practical effect is that the majority of the stock of appellee, which is apportioned among the twenty corporations according to the ovens owned by them, controls its operations. Each of the parties to contract A has a voice in the control of the appellant to the extent only of the stock of such party, which, unless a majority, is insufficient to control. If one of these corporations has a ma-

jority of stock, it may fix the selling price not only of its own production, but of the production of the others by controlling the agent corporation. If one of these corporations has less than a majority, it may not control the selling price of its own production or the price of the production of any of the others. The effect of the combination created by means of the contracts mentioned would not be different if the twenty corporations had agreed to exercise the powers conferred by the contracts in conjunction in their own names without an agent, or if a natural person had been made the agent instead of the new corporation. It may be said that the agent corporation agrees to guarantee the price to each of the parties; but, in its analysis, it is the guaranty of an incorporated company, the stockholders of which are the twenty corporations mentioned.

It clearly appears to us that all competition is destroyed among the twenty corporations by these contracts and this combination, and that they tend to restrain competition between the twenty corporations and others engaged in the same business. Illustrating how competition is destroyed among the twenty corporations, let us suppose that a contract for furnishing coke is to be let at a given time and place. Who is to be there to represent each of the twenty corporations separately in competition for that contract? Evidently no one, for this is an exclusive agency. The agent of the combination is to be there; but is it to be there for the purpose of having these several corporations compete with each other? No; it is to be there for the purpose of acting as agent for the combination, making a single negotiation for the contract without competition among these corporations.

It is argued that it has not been held unlawful for two or more competitors in the same business to employ the same sales agent. That is a different question. When a number of competitors, acting independently, employ the same agent, the agent acts independently for each. No one of the competitors has any control over the agent so far as the sale of the production of the others is concerned. While it may not have been held that competitors cannot employ the same agent, it is a different proposition for competitors to enter into a contract or contracts in effect to act in conjunction for

all the competitors in the sale of the production of all, and to restrain competition and control prices.

It may be claimed that the restraint of trade shown in this case is only incidental and commensurate to a main object of the contract lawful in itself. The purpose of this transaction, as stated in contract A, is as follows: "Whereas it is deemed expedient that there should be some arrangement perfected to improve conditions in the manufacture, inspection and shipment of coke, and to regulate and to improve the quality of coke manufactured in the district mentioned." Conceding for the sake of argument that the purpose stated is lawful, we are not limited, in ascertaining the real purpose of the contract, to a consideration of the purpose stated. Noyes on Intercorp. Relations, section 355; *People* v. *North River Sugar Refining Co.*, (N. Y.) 54 Hun. 376; 11 Coke 84. If all that was necessary in order to render legal a contract otherwise illegal, because in unreasonable restraint of trade, were to state in the contract a legal main purpose, such statement would furnish an easy evasion of the law. Under the rule laid down by Judge Taft, was the restraint only ancillary and commensurate to a lawful main purpose, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect it from an unjust use of those fruits by the other party? We are clearly of the opinion that it was not necessary, in order to arrange for the improvement of conditions in the manufacture, inspection and shipment of coke and in order to regulate and improve the quality of coke manufactured by said corporations or in said field, for the said corporations to form a trust or combination, the direct effect of which is to destroy all competition among them, to pool their production and to cause them to enter the market for the sale of their combined production as a single concern and which tends to restrain competition between them and others engaged in the same business. Nor was such protection necessary to any other lawful purpose disclosed by the contracts, in view of the facts appearing.

It is pointed out that contract B contains the following provision: "Provided; however, that, whereas the party of the second part has made or may make arrangements or contracts to act as the selling agent for other producers of coke

than the party of the first part, therefore the party of the second part shall only be required to take such quantity of coke from the parties for whom it acts as agent, as railroad facilities may be furnished to transport, and the party of the second part shall also only be required to take such quantity of coke from all persons whom it represents as agent as market conditions will enable it to dispose of at or above the cost of production." It is insisted that this provision relieves the contract from the charge that it restrains competition among the twenty corporations. If there is any virtue in the argument, it affects only the question of production. It may be plausibly argued that the contracts do not restrain production so long as the coke may be sold at cost; but we cannot see that such provision in any way prevents the destruction of competition in the market. It is the duty of the appellee to sell down to cost if necessary, but it is likewise its duty to sell at the best price the market affords. These duties are embodied in a private contract between the parties; and it is neither natural nor probable that this agent (appellee) would present this private contract, showing that it must sell at cost if it cannot get more, or make the contents of the contract known to contemplated purchasers, when negotiating sales to them. Again, is there any competition among these twenty corporations in any sale made by the agent above cost? Certainly not. We think that it would be a very rash conclusion to say that this combination was made and that these corporations are operating alone for the purpose permanently of selling at cost and no more. It must be conceded, also, that the effect of this provision is to destroy all competition below cost; or, as claimed, that it operates against destructive competition. It is argued, however, that this is lawful, and that the public cannot compel competition below cost. The public cannot compel competition at all; but the law, in the interest of public policy, can and will remove unreasonable restraints by contract upon competition, by refusing to enforce the contract and leaving the parties free to compete if they choose. The fact that the purpose of a contract is to avoid destructive competition will not save it from illegality if it is in unreasonable restraint of trade. *U. S. v. Addyston Pipe & Steel Co.*, *supra*. Other cases might be cited.

It is claimed that this contract cannot be declared illegal because it does not appear what part or per cent. of the total production of the Pocohontas-Flat Top 'Coal Field is produced by the twenty corporations. It is said that together they may produce only one per cent. of the total production of the field. As we have said before, it is not essential that the monopoly be complete before it is illegal. Unreasonable restraint of trade which is only partial is illegal. *Charleston Nat. Gas Co.* v. *Kanawha Nat. Gas, Light & Fuel Co.*, *supra.* As to this feature of the case, and upon the question of the reasonableness of the restraint of trade, we are assisted in reaching our conclusion by cases previously decided by this and other courts. In the case of *Slaughter* v. *Thacker Coal & Coke Co.*, *supra*, the combination was composed of only three coal companies, and the contract was held illegal and void, because it tended to suppress competition and restrain trade, contrary to public policy. In *Charleston Nat. Gas Co.* v. *Kanawha Nat. Gas, Light & Fuel Co.*, *supra*, a contract between two gas companies, restraining competition and controlling prices, was held illegal. In the case of *C. & O. Fuel Co.* v. *U.S.*, *supra*, the combination was among fourteen firms, persons and corporations producing and dealing in coal, and the combination was held illegal under the act of Congress, and, according to the principles there announced, would no doubt have been held illegal under the common law. Attention might be called to the fact that, in the statement of the purpose of the combination contained in contract A, the power to control the district mentioned, (the Pocahontas-Flat Top Coal Field) is assumed for the purposes of the contract. The contract expressly assumes the power for its purposes to *"regulate and improve the quality of coke manufactured in the district mentioned."* Whether or not these corporations were in error as to the extent of their power, we do not know. It is sufficient to say that they assume power over the district by their contracts,

We can but conclude that the combination established by contracts A and B is in unreasonable restraint of trade and against public policy, and that, when all the powers of the contracts are exercised, the direct and necessary or natural effect is to restrain competition and control prices; that such effect is not merely incidental, commensurate or necessary to

the protection of the parties in the enjoyment of the legitimate fruits of a lawful undertaking.

It is claimed that the motion to dissolve the injunction should not have been heard, because the defendant was then in contempt for violating the injunction. We have examined the affidavits on this subject, and cannot see that the judge of the circuit court was in error in hearing the motion. Inasmuch as contract B, which constitutes the basis of this suit, is void, because against public policy, there is no equity in the bill, and for this reason the motion to dissolve should have been sustained. Another reason for sustaining in part the motion to dissolve is that, so far as the injunction was mandatory, compelling the delivery and transfer of property to the appellee pending the suit and without notice, the injunction was void and without due process of law, as fully indicated by the decision and opinion of this Court in the prohibition case of *Powhatan Coal & Coke Co.* v. *Ritz, Judge*, recently determined by this Court.

For the reasons stated, the order of the judge of the circuit court overruling the motion of appellant to dissolve the injunction is reversed, and the motion sustained, and this cause remanded to be further proceeded with in accordance with the principles herein announced and the rules governing courts of equity.

*Reversed and Remanded.*