## THE PEOPLE *v.* GALANES ET AL.

### APPEAL from the District Court of Mayagüez.

No. 127.—Decided June 11, 1909.

CRIMINAL LAW—RESTRAINT AND MONOPOLY—EVIDENCE OF EXISTENCE OF CONTRACT.—The fact that the defendants had agreed among themselves to rent all or nearly all the working bakeries of the city of Mayagüez, and to raise the price of bread, constitutes no evidence of the existence of a legal contract, inasmuch as the existence of the consideration was not proven, nor what were the stipulations thereof and who were the parties entering into said contract.

ID.—MONOPOLIES (TRUSTS)—ELEMENTS ESSENTIAL TO THEIR EXISTENCE.—In

order to constitute a trust, some arrangement, direct division of properties, restrictive contract, or similar elements, must be shown to exist, in addition to the mere alleged combination or conspiracy.

ID.—MONOPOLY (TRUST)—JUDICIAL ENTITY—ORGANIZATION OF A TRUST.—In this class of offenses it is necessary to prove the existence of a definite organization as a juridical entity comprised within some known definition of the word "trust"; but even supposing that a trust has been organized, that is not enough to convict the defendants.

ID.—MONOPOLY (TRUST)—DESTRUCTION OF COMPETITION—DETRIMENT TO THE PUBLIC.—According to the doctrine laid down by the court, one of the essential elements to the existence of a monopoly is the destruction of free and lawful competition, as well as the detriment that thereby may be caused to the public.

ID.—MONOPOLY (TRUST)—DEFINITION.—A monopoly exists where all or nearly all of an article of trade or commerce within a community or district is brought within the hands of one man, or set of men, so as to practically bring the handling or production of the commodity or thing within such single control, to the exclusion of competition or free traffic therein. Anything less than this is not a monopoly.

ID.—MONOPOLY (TRUST)—CONTROL OF PRICE.—According to the jurisprudence established, one of the principal elements which must coexist with a monopoly is a single control of the price of the commodity in any community.

ID.—FEDERAL ANTITRUST LAW—FORAKER ACT—CONTRACTS IN RESTRAINT OF TRADE—APPLICATION TO PORTO RICO.—The Federal Antitrust Law of July 2, 1890 (U. S. Statutes at Large, vol. 27, p. 209 of 1890), is applicable to Porto Rico, under section 14 of the Foraker Act, in everything having reference to contracts in restraint of trade, and the insular Law of March 14, 1907, which prohibits contracts in restraint of trade is against the Foraker Act, a district court having no jurisdiction to take cognizance of a cause based on such contracts.

The facts are stated in the opinion.

*Messrs. Sweet, Rossy and Campillo* for appellants.

*Mr. Rossy, fiscal,* for respondent. .

MR. JUSTICE WOLF delivered the opinion of the court.

This was a prosecution begun by the People of Porto Rico against Victor Galanes and others for a violation of the act to protect trade and commerce against unlawful restraint and monopoly, such law being approved on the 14th of March, 1907, Session Laws 1907, 328.

The prosecution was begun against five persons. The sentence of the court finds three of them guilty, namely, Baldomero Romero, Victor Galanes and Manuel López. The defendants so declared guilty by the court were each fined the

sum of $1,000 and the costs of the proceedings, and in the event of their not paying said fine immediately, were ordered to be sent to prison for the period of one year until the fine was totally satisfied. The said three defendants have all appealed to this court.

A demurrer was filed in the court below to the information substantially on the ground that it charged more than one offense, defendants having reference to section 153 of the Code of Criminal Procedure, and no error is alleged in the brief of the appellants on account of the action of the court in this regard. The evidence was brought up in the form of a statement of facts and embodied proof on the part of the Government tending to show that the defendants, namely, Victor Galanes and Manuel Torrado, and possibly others not convicted, agreed among themselves to rent all or nearly all the working bakeries in the city of Mayagüez and to raise the price of bread and that the price of bread had in fact increased. These facts were attempted to be shown principally by the evidence of the witness, Rivera, who said he overheard some one or other of the defendants agree that they would rent all the bakeries, and that he also heard them persuade the defendant, Torrado, to agree to raise the price of bread. He also said that he knew that 15 or 16 bakeries were rented by defendants because "when they want to form a monopoly or trust it does not suffice to rent two or three bakeries; they must rent all or none." The witness here was not giving facts but his own conclusions or inferences from the fact that the price went up. If the conviction of the defendants is to depend upon the fact of their having rented all or nearly all the bakeries of Mayagüez, his testimony is too vague, indefinite and uncertain to attain that end. The facts adduced by the other witnesses contradict his inference. The fact of the rental by the defendants was also attempted to be proved by the policeman, Francisco Ortiz Lebrón, who, on cross-examination, admitted that he had no personal knowledge of the facts. We shall take up

later in greater detail the evidence of such control as the defendants may have had of the bakeries and the price of bread in Mayagüez. There was no sufficient proof of the connection of Baldomero Romero with the alleged combination. Nobody mentions him specifically. At one time Rivera says "the defendants," but when he names them he names other bakers than Baldomero Romero. The criminal law requires something more to convict a defendant.

An examination of the statement of the case fails to show any proof to support the first count of the information. That count charged, among other things, that defendants made a contract among themselves. There was no contract shown either among the defendants themselves or by the defendants on the one side and any other person or persons on the other. The proof giving it all the force for which the prosecution contends merely shows that defendants agreed among themselves to rent practically all the ovens and bakeries in the city of Mayagüez and raise the price of bread; but this agreement did not rise to the plane of a legal contract, no consideration, no terms and no definite parties being shown.

The second count charges a combination in the form of a trust. The count fails to set out what the peculiar nature of the alleged trust was or the facts constituting it other than in saying that the defendants rented all or the majority of the bakeries and ovens existing and given over to the making and preparation of bread in the city of Mayagüez; in the same manner as does each of the other counts. The use of the word "trust" is rather indefinite and as used in the count explained neither by the words that follow nor by the count itself nor yet by the proof. There was no definite organization nor physical entity shown which would meet any known definition or popular notion of a trust. But even supposing that a trust had been organized, that is not enough to convict the defendants. Specific facts as to control were charged and must be proved. Even if the facts tended to show a specific control over the price of bread, by reason of the concerted action of

the defendants, something of their relations one to another must be shown before a trust can be said to exist. The evidence does not show the relations of the defendants to one another. In order to constitute a trust some arrangement, direct division of properties, restrictive contract, or similar elements must be shown to exist in addition to the mere alleged combination or conspiracy. The count otherwise sets up the same facts that are set up by the following counts.

The third count, liberally construed, sets up a conspiracy which has had the result of monopolizing the sale of bread in Mayagüez by the said defendants, and that the price of bread has risen and the lawful and free competition has been destroyed to the detriment of the people of the city of Mayagüez.

The fourth count sets up facts similar to the third and charges directly that the defendants formed a monopoly.

The fifth count sets up that the parties conspired and combined with the object of monopolizing trade and commerce, restraining the free and lawful competition in the making of said article and raising the price of the same, and that they did certain things such as the renting of bakeries as described by the other counts, and that competition had been destroyed and a monopoly created. The prosecution is not conducted on the theory that the defendants attempted to form a monopoly and failed, but that a monopoly was actually created by them and was in existence at the time of the bringing of the information, in other words, the third, fourth and fifth counts all proceed on the theory that the defendants have either conspired to create and succeeded or have created a monopoly by which the price of bread has been raised and the lawful and free competition in the sale of said article destroyed to the detriment of the people of the city of Mayagüez. This is further shown by the opinion of the court where it says:

"With these premises and after having taken into consideration the accusation made, the evidence introduced and the allegations advanced

by the defense and the prosecution, the court has reached the conclusion that it is a fact, proven beyond all reasonable doubt, that the accused Manuel Torrado, Victor Galanes and Baldomero Romero, agrceing among themselves, have combined and confabulated in secret with the object of impending, or obstructing, restricting and destroying the legal and free competition in the sale of bread, which is an article of necessity and of general use, and of controlling the sale of said article in order so to raise its price, all of which they secured, and realized and continue to secure and realize, destroying competition, raising the price of said article without any justifiable cause or reason, and controlling among themselves the sale of said article to the detriment and to the prejudice of the public of this city, using as a means to carry out their deliberate purpose the rental of the most important bakeries in this city, excluding by their organization the other industries of this class and preventing the formation or consolidation of others, the result of this being that the said accused persons have completely monopolized the sale of an article of such absolute necessity, thus depriving the community of the benefits of competition in the production and sale of the said article, which competition has been made impossible by reason of complete and absolute control that the said accused persons have exercised and do exercise in the business and the manufacture and sale of bread."

And the theory of the *fiscal* of this court was to the same effect, as shown by this brief and argument.

We have considered the law with respect to monopoly, the element of the destruction of the free and lawful competition as well as the detriment to the public are included in each definition of the word as laid down by the courts. So far as the monopoly alleged is a combination of individuals as distinguished from "an institution or allowance by a grant from the sovereign power of state such as patent, copyrights and the like." Bouvier thus defines it: "The abuse of free commerce by which one or more individuals have procured the advantage of selling alone all of a particular kind of merchandise, to the detriment of the public." "Any combination among merchants to raise the price of merchandise to the injury of the public." These two definitions are somewhat vague, but they show that one of the essential elements to the existence of a

monopoly is the detriment to the public. Likewise the second definition would seem to indicate that the rise in the price of merchandise must be the result of the combination; and the first definition shows as likewise constituting a monopoly the advantage of selling alone all of a particular kind of merchandise.

In this connection the *fiscal* of this court cites us to the case of *Herriman* v. *Menzies,* 115 Cal., 16, where the existence of monopoly is thus defined: "A monopoly exists where all or nearly all of an article of trade or commerce within a community or district is brought within the hands of one man or set of men, so as to practically bring the handling or production of the commodity or thing within such single control, to the exclusion of competition or free traffic therein, and anything less than this is not a monopoly." This is the most adequate definition of a monopoly that we have found.

The Supreme Court of the United States in the case of *U. S.* v. *Freight Association,* 166 U. S., 291; and the *Northern Securities case,* 193, U. S., 332, holds that a monopoly need not be complete to make it illegal, and the latter case likewise set forth that the courts "will not stop to inquire as to the degrees of injury inflicted upon the public. It is enough to know that the inevitable tendency of such contracts is injurious to the public.

It is one of the weaknesses of the prosecution in this case that while a monopoly is charged in various forms and the results of said monopoly attempted to be shown, there is nothing to show the nature of the relations existing among the parties to the said illegal scheme or combination. Neither the prosecution nor the proof show in the slightest degree the relations or the arrangements that were made by the defendants among themselves or with López.

The evidence shows that somewhere on or about the spring of 1907 there had been six bakeries working in Mayagüez. They are named in the testimony of José A. Rivera and they are as follows: the bakeries of Striker, Monserrate Ramírez,

Victor Galanes, Manuel Torrado, Baldomero Romero and the bakery the federation which Evangelista Segarra represented.

Each one of the counts of the prosecution charges that the defendants rented all, or nearly all, of the bakeries in Mayagüez and closed all but three. The testimony is clear to the effect that no other bakeries than these six were working at and immediately before the time of the alleged illegal combination and alleged consequent monopoly. There were other bakeries than these six, some 15 or so in number. There was clear evidence to the effect that they were not working and that their failure to work was due to the competition then existing in Mayagüez. Both the witnesses of the prosecution and of the defense agreed in saying that they had stopped work on account of the competition.

A perusal of the entire statement of facts is bound to convince one that there was a slump in the price of bread in Mayagüez. Nearly all the witnesses, and independently of the six named, said that they had practically ceased making bread because of such competition.

Under the statement of facts there can be little doubt, that the defendants or one or more of them bought out some of the clientele of the nonworking bakeries and made or attempted to make a contract by which some bakeries should cease to make bread. There is nothing, however, tending to show that this was an agreement for them to quit making bread except in their particular district or among their particular clientele. Indeed, some of them testified that they were free to do as they chose in any event.

The first Government witness, José Rodríguez, said that he was not prevented from making bread and that he only hired out his business and clientele.

The second witness, Juan L. Rosas, said that he rented out his bakery under the condition that he should not make bread, but he also testified that he could have made bread in his bakery, that nobody could have prevented him, and he also

testified that he had not made bread for more than one year but that he might have done so if things had gone well. He is the only witness who testified that he made a contract not to make bread, but he testified at the same time that he could do what he chose with his oven.

Rosendo Segarra testified that he was sought by Galanes to work in the bakery of the latter and that the witness himself made the condition that he should be paid the rental of his own bakery, but also that he closed his bakery because he was losing money and that at the time the testimony was taken he was free to rent to anyone.

José Capella said that the bakery which he represented was hired to one López, but he had no recollection of any agreement to the effect that it should be closed.

The fifth witness, Vicenta Cruz, testified that her bakery was out of order and that it was merely her store that was rented.

Antonio Morales, among other things, testified that he could have made bread in his bakery.

Acisclo Striker, who was one of the six workers which were named, testified that he was about to close his bakery by reason of some difficulty which he had when it was rented from him by Mr. López or Mr. Galanes. The object of the agreement was that the witness should turn over to Galanes the sellers and customers he had, and that he did not agree to anything else.

These were all the witnesses for the prosecution with the exception of José A. Rivera and Francisco Ortiz Lebrón whom we have already considered. Neither of these witnesses testified to any personal knowledgde of the closing of the bakeries nor the reasons therefor, nor does Rivera show any relations whatsoever that any of the defendants had with any of the bakeries except that he saw a workman of Striker go to the house of Romero to be paid, but that he did not see him paid although he saw him going out. It is impossible to

realize or say what was the transaction that the witness saw or thought he saw.

Of the six alleged working bakeries, Striker, as already shown, was the only one to rent out his sellers and his customers, but he did not promise to do anything else. With respect to him the statement of the information and the inference of the witness, Rivera, are negatived. There was a number of witnesses for the defense, namely, Manuel Montalvo, Ramón Martínez, Lalo Vargas, Clemente Javierre, Juan Cárdenas, all testifying to the fact that none of the accused ever took any steps to rent their bakeries or to cause them to be closed, they all being bakers and having ovens in Mayagüez.

Monserrate Ramírez was a witness for the defense. He was one of the six working bakers in Mayagüez. On direct examination he testified that he had not worked in his bakery for four or five months because he was a little sick and because flour had gone up, hence that he had not any agreement with the defendants nor did he rent his bakery, but he was disposed to rent it if they made him a suitable offer. Cross-examined by the *fiscal* he said that he retired from business because his foot became sore and one of his employes went away, and that he lost his business by reason of the competition in the sale of bread. For 15 or 16 years he had been working in his bakery and when it did not suit him he closed it up. He closed it latterly because of his sore foot.

Evangelista Segarra, who was another of the six working bakers, denied that defendants had made any proposition to him to raise the price of bread, that he as president of the Union of Bakers, caused a reduction in the price of bread because there was a majority without work and they decided to make bread and consequently it was sold at low prices. On causing this reduction they did not draw any salary, but only made what they could to support themselves and consequently the reduction was ruinous for them all, and they stopped work in June. He had not gone to Torrado to propose the

renting of his bakery in the month of June on the 27th of that month, nor did the defendants propose any arrangement with him to raise the price of bread. That the weight of the loaf when sold at one cent was 100 grams and that afterwards the loaf at two cents weighed 150 grams.

Questioned by the *fiscal* he said that during all the time the Union bakers were working the weight was 100 grams. They stopped work in consequence of the raise in the price of flour and the scanty credit inasmuch as the Union was working with little means. Although the price of flour went up the working expenses were the same and the bakers of the Union, which were 25 in number, could not support themselves with the wages to be obtained. All were competing against one another and this was one of the causes of the withdrawal of the Union men from the business, and some of them found situations with Ganales and Torrado.

A number of witnesses testified as to the rise in the price of flour. They agreed that the price of flour in May varied from $4.10 to $5.25 for a sack of 200 pounds but that in June and July the price went up and varied from $5.50 to $6.25, it being impossible in the nature of things to determine what was the exact price of flour during the time of the alleged rise in the price of bread. From the testimony, however, there is no doubt that when bread was sold at one cent a loaf the latter weighed 100 grams, and when it was sold at two cents a loaf it weighed 150 grams. Taking the very highest of the price of flour in May, namely, $4.25, and the lowest price at the time of the alleged monopoly, namely, $5.50, there was nevertheless a rise of about 30 per cent in price. It may have been more. It could not easily have been less. The witness, Francisco Morales, calculates that there was a rise of 30 per cent. Some of the others indicate it as more.

If you take a loaf of 100 grams and a loaf of 150 grams, the latter is worth 50 per cent more than the former. If the cost of flour is increased 30 per cent the selling price of a loaf of bread of 150 grams would also be normally increased to a

proportional extent. The 30 per cent of 150 is 45, so that added to the comparative value of the loaf weighing 150 grams, if the loaf of 100 grams was worth one cent, would make the loaf of 150 grams 1.95 cents. To put it a little differently, if a loaf of bread is worth one cent and flour increases 30 per cent, the value of a loaf of bread may be said to increase correspondingly and to become worth 1.3 cents; and if the weight is increased from 100 grams to 150 grams the value has increased 1.5 times, so that multiplying 1.3 by 1.5 the resulting value is 1.95 cents.

The evidence demonstrates that there was a slump in the price of bread and that also there was possibly (and the defendants are entitled to every reasonable doubt that might arise). a rise of more than 30 per cent in the price of flour, so that in proportion to the increase in the price of flour and in the weight of the loaf, the public was getting a loaf of bread from which the sellers derived no greater profit than was derived from the sale of bread when the conditions were normal. It is therefore clear that the detriment to the public has not been shown by reason of the rise in the price of bread. If such detriment actually existed by reason of such alleged rise the Government has not brought the proper witnesses to prove it.

We have casually discussed the fact that no contract or trust was shown by the prosecution; but the evidence is defective in another essential respect although possibly both defects spring from the same cause. We have seen that the definitions of monopoly include the destruction of competion. There was no testimony that the defendants or anybody agreed not to compete in the sale of bread in Mayagüez among themselves. To say that they did is the merest inference from the vague testimony of Rivera and the alleged fact that there was a rise in the price of bread and any action on the part of the defendants or any other person or persons. There was no proof to show that there was an artificial rise in the price of bread. From all that the proof discloses the operation of

the law of demand and supply was never artificially suspended in the city of Mayagüez. Indeed, the indications are that bread continued to be sold at a price which made very little difference in the percentage of profits to the bakers.

We have seen in the decisions of the Supreme Court of the United States, as well as in other cases, that one of the principal elements which must coexist with a monopoly is a single control of the price of the commodity in any community. (*U. S.* v. *Freight Association,* 166 U. S., 291; *Northern Securities Co.* v. *United States,* 193 U. S., 332; *Pocahontas Coke Co.* v. *Powhatan Coal & Coke Co.,* 60 W. Va., 508; 10 L. R. A. [N. S.], 268, and cases cited on page 282; *MacGinnis* v. *Boston Etc. Min. Co.,* 29 Mont., 428; 75 Pac., 89; *Herriman* v. *Menzies,* 115 Cal., 16.)

It makes no difference for determining the existence of a monopoly whether the price of an article is raised or lowered. What the law prohibits is the power arbitrarily to control the price. Viewed by these tests we fail to find any testimony to show that the defendants did or could artificially control the price of bread and put it beyond the sphere of competition. Not only was there a failure to show that the defendants agreed not to compete among themselves, but it was not shown, as the information charged, that they did actually close all or nearly all of the bakeries in Mayagüez. Of the alleged six working bakeries existing at a period immediately before the combination the proof fails to show that the defendants had control of three of them, namely, the bakery of Monserrate Ramírez, that of Segarra and that of Striker, the last named a Government witness.

The record fails to disclose who had control of the bakery of Baldomero Romero. However, the defendants in their brief set up the fact that this bakery was sold to Torrado, and they speak of a bill of sale in the record from Romero to Torrado. But such was never properly made a part of the statement of the case.

There were other bakeries in Mayagüez and there is nothing to show that these bakeries would not have immediately operated to keep the price down if there had been any attempt on the part of anybody artificially to raise the same. There may have been other local conditions which made it difficult or impossible for other bakers to compete; but these conditions if they existed, were not brought to the notice of the court.

We are altogether at a loss to understand the conviction of Baldomero Romero, and this very conviction of a man against whom there was practically no evidence leads us to infer that the court must have had in mind facts or circumstances which were not brought into the evidence. Tested by the conviction of Romero we feel that the evidence in the case was never properly weighed or considered. The court stated the law pretty well in its opinion, but the facts did not show a state of circumstances which constituted a monopoly.

There is another thing to be noted in passing, and that is, that the Federal Antitrust Law of July 2, 1890, U. S. Statutes at Large, vol. 27, p. 209, of 1890, applies to the territories. Under section three therein contracts in restraint of trade are forbidden in the District of Columbia and the territories; but that law says nothing with respect to monopolies. We think that the Federal law would control as far as it went, and hence that the court did not have jurisdiction to entertain an information with respect to contracts in restraint of trade, in other words that the part of the Law of March, 1907, which attempt to restrict contracts in restraint of trade, is against the Organic Act inasmuch as the act provides for the application here of all laws of the United States which are not locally inapplicable. (Section 14 of the Organic Act.) To this effect is the decision in the case of *Territory* v. *Alexander*, 89 Pac., 514.

For the reason that the facts set out in the information have not been proved for the reason that the defendants were convicted without sufficient proof, we think the case must be sent back for a new trial.

*Reversed.*

Chief Justice Hernández and Justice Figueras concurred.

Mr. Justice MacLeary concurred in the sentence, but dissented from the opinion.

Mr. Justice del Toro took no part in the decision of this case.